**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-00539-NYW-MEH

EVANS LAW PLLC, and
KEVIN D. EVANS,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on Defendant's Second Motion for Summary Judgment (or "Motion"). [Doc. 80]. Plaintiffs Evans Law PLLC and Kevin D. Evans (together, "Plaintiffs") have responded in opposition. [Doc. 84]. Defendant U.S. Department of Justice ("Defendant" or "DOJ") has replied. [Doc. 85]. Upon review, the Court concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth below, the Motion is respectfully **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

In November 2020, Plaintiffs submitted a Freedom of Information Act ("FOIA") request to DOJ. [Doc. 1 at ¶ 5; Doc. 14 at ¶ 5]. The FOIA request sought documents relating to any relationship between Hunter or James Biden and China, Russia, or

Ukraine.  [Doc. 80-1 at 23].[1]  DOJ made a limited initial disclosure in March 2021.  [Doc. 1 at ¶ 15; Doc. 14 at ¶ 15].  Unsatisfied by the initial disclosure and DOJ's subsequent communications, Plaintiffs commenced this suit in March 2022.  [Doc. 1].  Plaintiffs seek injunctive relief under FOIA ordering DOJ to "produce all requested documents."  [*Id.* at 7]; 5 U.S.C. § 552(a)(4)(B).

At the Parties' request, the Court administratively closed the case from May 2024 to January 2025, pending the criminal prosecution of Hunter Biden.  [Doc. 62; Doc. 63; Doc. 65; Doc. 68].  Hunter and James Biden eventually received presidential pardons, [Doc. 80 at ¶ 17; Doc. 84 at 9 ¶ 17], and the Court reopened the case, [Doc. 68].  After the pardons, DOJ "reassessed" its response to Plaintiffs' FOIA request.  [Doc. 80 at ¶ 18]. DOJ contends that it made a final "second supplemental response" in May 2025 that satisfied its FOIA obligations.  [*Id.* at ¶¶ 21, 35].  DOJ admits that some information was withheld but asserts that all withholdings are authorized by FOIA's exemptions.  [*Id.* at ¶¶ 24–34].  The records at issue are portions of eight pages of email communications between DOJ officials, portions of eight pages of a chart summarizing then-ongoing nonpublic criminal investigations, and the entirety of a three-page memorandum.  *See* [*id.* at ¶¶ 22–23].  DOJ now moves for summary judgment.  *See* [*id.*].

## LEGAL STANDARDS

### I.   Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

---

[1] When citing to page numbers in filings, the Court cites to the page number assigned by the Court's Case Management / Electronic Case Files (CM/ECF) system.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

If the movant demonstrates that no genuine issues of material fact exist, the burden shifts to the non-movant to "set out specific facts showing a genuine issue for trial." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (quoting Fed. R. Civ. P. 56(e)(2)). The non-movant must point to competent evidence showing a genuine factual issue; it cannot rely on "[u]nsubstantiated allegations" or "mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). In considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## II.   Freedom of Information Act

"Congress enacted FOIA to facilitate public access to federal agency records and information." *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 921 (10th Cir. 2022). FOIA requires agencies to "make all records accessible to the public upon request." *Herrick v. Garvey*, 298 F.3d 1184, 1189 (10th Cir. 2002) (citing 5 U.S.C. § 552(a)(3)). But FOIA also provides nine exemptions "under which agencies may withhold requested information when disclosure would harm legitimate government or

individual interests." *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1260 (10th Cir. 2021); 5 U.S.C. § 552(b). Even where an exemption applies, though, FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." § 552(b). Thus, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Al-Turki v. Dep't of Just.*, 175 F. Supp. 3d 1153, 1185 (D. Colo. 2016) (quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1026–27 (D.C. Cir. 1999)).

FOIA authorizes federal courts to issue injunctions "order[ing] the production of any agency records improperly withheld from [a] complainant." 5 U.S.C. § 552(a)(4)(B). When an individual challenges an agency decision to withhold records, the Court "reviews de novo the agency's decision not to disclose." *Herrick*, 298 F.3d at 1189. During this review, the Court construes FOIA "broadly" and "in favor of disclosure" and construes its exemptions narrowly. *Friends of Animals*, 15 F.4th at 1260. "The agency bears the burden of justifying its nondisclosures." *Rocky Mountain Wild*, 56 F.4th at 921.

## UNDISPUTED MATERIAL FACTS

The following facts are drawn from the summary-judgment record and undisputed unless otherwise noted.

1.      By letter dated November 19, 2020, Plaintiffs submitted a FOIA request to DOJ's Mail Referral Unit ("MRU"). [Doc. 80 at ¶ 1; Doc. 84 at 8 ¶ 1; Doc. 80-1 at ¶ 7].

2.      Plaintiffs' request sought two categories of documents: (1) "Documents relating to Hunter Biden and pertaining to any relationship, communication, gift(s), and/or remuneration in any form with, to or from any individual or entity (government agency or

otherwise) from the countries of China, Russia, and/or Ukraine"; and (2) "Documents relating to James Biden and pertaining to any relationship, communication, gift(s), and/or remuneration in any form with, to or from any individual or entity (government agency or otherwise) from the countries of China, Russia, and/or Ukraine."  [Doc. 80 at ¶ 2; Doc. 84 at 8 ¶ 1; Doc. 80-1 at 23].

3.    The MRU determined that the DOJ component most likely to maintain the requested records was the Office of Information Policy ("OIP") and forwarded the request to OIP.  [Doc. 80 at ¶ 3; Doc. 84 at 8 ¶ 3; Doc. 80-1 at ¶¶ 8–9 & n.3][2]; *see also* [Doc. 80-1 at 27 n.1].

4.    On January 21, 2021, OIP acknowledged the request and began its search for documents.  [Doc. 80 at ¶ 4; Doc. 84 at 8 ¶ 4; Doc. 80-1 at ¶ 10; *id.* at 27–28]; *see supra* note 2.

5.    OIP determined that DOJ's Offices of the Attorney General ("OAG") and Deputy Attorney General ("ODAG") would be most appropriate to search, given that OAG and ODAG are most likely to oversee criminal law enforcement matters.  [Doc. 80 at ¶¶ 6–7; Doc. 84 at 8 ¶¶ 6–7; Doc. 80-1 at ¶¶ 2, 25]; *see supra* note 2.

6.    OIP searched the "retired files" for officials in OAG and ODAG; the email and electronic files of current and former OAG and ODAG custodians; and the

---

[2] Plaintiffs state that they "lack information or knowledge" as to this fact.  [Doc. 84 at 8 ¶¶ 3–11].  The Court deems the fact undisputed for purposes of the Motion.  *See* Fed. R. Civ. P. 56(e)(2).  The Court also affords a presumption of good faith to the unrebutted assertions in the Third Declaration of Vanessa R. Brinkmann, [Doc. 80-1], which is DOJ's primary support for its description of its search process, [Doc. 80 at ¶¶ 1–35]; *see Rocky Mountain Wild*, 56 F.4th at 922 (recognizing that the good-faith presumption "essentially requires [courts] to credit the agency's sworn statements absent contrary evidence" (quotation omitted)).

Departmental Executive Secretariat, which is the "official records repository" of OAG and ODAG.  [Doc. 80 at ¶¶ 8–10; Doc. 84 at 8 ¶¶ 8–10; Doc. 80-1 at ¶¶ 25–30]; *see supra* note 2.

7.      The "retired files" and Departmental Executive Secretariat searches used the keywords Hunter Biden and James Biden; the email and electronic files search queried the names Hunter Biden or James Biden in records where "China," "Russia," or "Ukraine" was also present.  [Doc. 80 at ¶¶ 8–10; Doc. 84 at 8 ¶¶ 8–10; Doc. 80-1 at ¶¶ 26, 28–29]; *see supra* note 2.

8.      OIP's searches used an open-ended start date and an end date of January 21, 2021—the date OIP began its search.  [Doc. 80 at ¶¶ 9, 11; Doc. 84 at 8 ¶¶ 9, 11; Doc. 80-1 at ¶¶ 28–29]; *see supra* note 2.

9.      In March 2021, DOJ disclosed 106 pages of responsive records to Plaintiffs.  [Doc. 80 at ¶ 12; Doc. 84 at 9 ¶ 12; Doc. 80-1 at ¶ 10].

10.      In May 2022, during a status conference in this case, DOJ represented that its search was "complete" and that it was reviewing 400 pages of potentially responsive documents.  [Doc. 84 at 14 ¶ 17; Doc. 85 at 6 ¶ 17; Doc. 84-1 at ¶ 19].

11.      In July 2022, DOJ issued a purported "final response" to Plaintiffs, stating that no additional responsive, non-investigatory records had been located and asserting a *Glomar* response[3] as to any investigatory records.  [Doc. 80 at ¶ 14; Doc. 84 at 9 ¶ 14; Doc. 80-1 at ¶¶ 12–13; *id.* at 144].

---

[3] A *Glomar* response is one that refuses to confirm or deny the existence of certain records in response to a FOIA request.  *See Wilner v. NSA*, 592 F.3d 60, 67 (2d Cir. 2009).

12.     In August 2023, David Weiss was appointed as Special Counsel for the criminal investigation and prosecution of Hunter Biden.  [Doc. 80 at ¶ 5; Doc. 84 at 8 ¶ 5; Doc. 80-1 at 2 n.1].[4]

13.     In October 2023, DOJ withdrew its *Glomar* response as to Hunter Biden and issued a "supplemental response" to Plaintiffs, disclosing eight pages of responsive information, subject to withholdings under certain FOIA exceptions.  [Doc. 80 at ¶¶ 15–16; Doc. 84 at 9 ¶¶ 15–16; Doc. 80-1 at ¶¶ 15–17; *id.* at 147–48].

14.     Hunter and James Biden received presidential pardons in December 2024 and January 2025, respectively.  [Doc. 80 at ¶ 17; Doc. 84 at 9 ¶ 17; Doc. 80-1 at ¶ 18 & nn.6–7].

15.     After the pardons, OIP withdrew its *Glomar* response as to James Biden and confirmed its searches related to him using the methods described above, *supra* at ¶¶ 6–7.  [Doc. 80 at ¶¶ 18–19; Doc. 84 at 9 ¶¶ 18–19; Doc. 80-1 at ¶ 19]; *see supra* note 2.

16.     OIP located no additional responsive documents.  [Doc. 80 at ¶ 20; Doc. 84 at 9 ¶ 20; Doc. 80-1 at ¶ 19]; *see supra* note 2.

17.     In May 2025, DOJ issued a "second supplemental response" releasing portions of eight pages of additional documents, with some information still withheld under

---

[4] Plaintiffs claim to "lack information or knowledge" of the date of the Special Counsel's appointment.  [Doc. 84 at 8 ¶ 5].  The Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).  And the Court takes judicial notice of the date of Mr. Weiss's appointment from the official DOJ press release, which is a source "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see* Press Release, U.S. Dep't of Just., Off. of Pub. Affairs, Appointment of a Special Counsel (Aug. 11, 2023).

asserted FOIA exemptions.  [Doc. 80 at ¶ 21; Doc. 84 at 9–10 ¶ 21; Doc. 80-1 at ¶ 21; *id.* at 158–67].

18.    DOJ has not searched for records in the Office of Special Counsel David Weiss.  [Doc. 84 at 15 ¶ 21; Doc. 85 at 6 ¶ 21].

19.    In total, DOJ has produced (1) eight pages of partially redacted email communications; (2) eight pages of partially redacted chart entries; and (3) 106 pages of unredacted records.  [Doc. 80 at ¶ 22; Doc. 84 at 9–10 ¶ 22; Doc. 80-1 at ¶ 31].

## ANALYSIS

The Court's analysis begins with the threshold issue of whether DOJ conducted an adequate search.  The Court then turns to the applicability of various asserted FOIA exemptions before addressing the Parties' remaining arguments.

## I.    Adequacy of the Search

Courts apply a "reasonableness rule" when determining the adequacy of an agency's search.  *Rocky Mountain Wild*, 56 F.4th at 922 (quoting *Trentadue v. FBI*, 572 F.3d 794, 797 (10th Cir. 2009)).  This inquiry focuses on the "agency's search process, not the outcome."  *Id.* at 923.  The search must be "reasonable in scope and intensity."  *Id.* (quotation omitted).   The reasonableness inquiry takes account of a case's circumstances, as well as "the probability that the search will discover responsive documents, the availability of other search methods, and the feasibility of those alternative methods."  *Id.*  "[T]he issue is not whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate."  *Id.* (quotation omitted).

DOJ contends that it reasonably searched for responsive records. Because Plaintiffs did not direct their request to any specific DOJ component, DOJ's MRU was required by regulation to forward the request to the component most likely to contain responsive records. [Doc. 80-1 at ¶¶ 7–8]; 28 C.F.R. § 16.3(a)(2). MRU forwarded the request to OIP, who confirmed to Plaintiffs that it had received the request and would search the records of the OAG and ODAG. [Doc. 80-1 at 27–28, 30–31]. OIP searched the OAG's and ODAG's "retired" files, their electronic and email records, and the Departmental Executive Secretariat. *See* [*id.* at ¶¶ 25–30]. DOJ asserts that there were no "'indicia that other offices for which OIP processes FOIA requests would be reasonably likely to maintain distinct records' . . . during the relevant timeframe." [Doc. 80 at 15–16 (quoting [Doc. 80-1 at ¶ 30])].

Plaintiffs do not dispute the adequacy of OIP's initial search parameters. They argue instead that OIP unreasonably failed to search for records in the Office of the Special Counsel. [Doc. 84 at 30–31]. Plaintiffs suggest that an agency must search a specific location when it "comes to learn during a case that responsive records exist and [their] location." [*Id.* at 31]. DOJ maintains that OIP was not required to search the records of a component outside its "ambit" or search for records that did not exist at the time it began its search. [Doc. 80 at 16–19; Doc. 85 at 6–8].

The Court respectfully concurs with DOJ that it was not obligated to search for records created after the date it began its search. Although the Tenth Circuit has not addressed the issue, the clear weight of persuasive authority holds that an agency may reasonably use the date the search begins as a cutoff. *See, e.g.*, *McClanahan v. U.S. Dep't of Just.*, 204 F. Supp. 3d 30, 47 (D.D.C. 2016) ("[A] date-of-search cut-off has

routinely been found to be reasonable, even if the agency performed subsequent searches." (collecting cases)), *aff'd*, 712 F. App'x 6 (D.C. Cir. 2018); *Fox News, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 536 (S.D.N.Y. 2010) ("[C]ourts have consistently held that an agency may limit its FOIA search to records created on or before the date of the commencement of the search." (collecting cases)).  The D.C. Circuit has implicitly endorsed a date-of-search cutoff.  *See McGehee v. CIA*, 697 F.2d 1095, 1104 (D.C. Cir. 1983) (proposing sample procedures in which an agency would search for all documents in its possession "at that time," which would produce a "much fuller search" than one using a date-of-request cutoff); *Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) ("The D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests." (citing *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 642 (D.C. Cir. 2002) (rejecting date-of-request cutoff and observing that "[a]t the very least, we think that with minimal administrative hassle, the Department could apply a date-of-search cut-off")).  So too do DOJ's regulations.  28 C.F.R. § 16.4(a) ("In determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date that it begins its search.").  If anything, the disagreement on this issue is between a date-of-search cutoff and a date-of-*request* cutoff.  *See Wilson v. U.S. Dep't of Treasury*, No. 15-cv-09364, 2016 WL 8504990, at *4 & n.4 (N.D. Ill. Oct. 12, 2016) ("[C]ourts are split on the issue of whether a date-of-request or a start-of-search cut-off date is proper." (collecting cases)).  But all quarters appear to agree that some temporal limitation is necessary to avoid imposing an "an ever-moving target for the production of documents under FOIA." *Edmonds*, 383 F. Supp. 2d at 111. As then-Judge Ginsburg observed, requiring an agency to "adjust or modify its FOIA

responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing." *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991).

Plaintiffs concede that the Office of the Special Counsel was not established until August 2023, approximately two-and-a-half years after DOJ began its original search. [Doc. 80 at 31]. Nevertheless, they attempt to sidestep these precedents by suggesting that this case presents a unique situation "where the agency subsequently learns of the location of responsive documents." [*Id.*]. Plaintiffs invoke case law holding that an agency cannot ignore "obvious leads" when determining *where* to search. [*Id.* at 30]; *see Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325–26 (D.C. Cir. 1999) ("[T]his court has required agencies . . . to follow through on obvious leads to discover requested documents. . . . The agency cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." (cleaned up)). But cases about where an agency must search are inapposite to whether an agency may reasonably apply a temporal cutoff.

Nor does the Court perceive this case as especially unique, despite the notoriety of the subjects. In the many cases where, as here, a FOIA request seeks information about an ongoing government activity, the agency is presumably aware that relevant documents are being generated on an ongoing basis. In such a situation, the agency's awareness of documents post-dating its original search does not detract from the reasonableness of a start-of-search cutoff. *See, e.g.*, *Am. Oversight v. U.S. Dep't of Just.*, 401 F. Supp. 3d 16, 36 (D.D.C. 2019) ("[T]he fact that DOJ chose to produce a document that post-dated the beginning of its search efforts does not mean that DOJ was legally

11

required to search for records that originated after the search began."); *Rocky Mountain Wild v. U.S. Bureau of Land Mgmt.*, 445 F. Supp. 3d 1345, 1363 (D. Colo. 2020) (concluding that agency reasonably applied original start-of-search cutoff date to later supplemental search, even though initial request and search occurred during "ongoing agency decisionmaking"). A contrary rule would create the "endless cycle of judicially mandated reprocessing" that courts have sought to avoid. *Bonner*, 928 F.2d at 1152. And any prejudice to the requesting party is mitigated by the fact that the requester "may easily file a follow-up request for documents created after the date the search commenced." *Fox News*, 739 F. Supp. 2d at 536.

Finding no other defects in DOJ's search procedure, the Court concludes that DOJ has established that its search for documents existing on January 21, 2021 was "reasonable in scope and intensity." *Rocky Mountain Wild*, 56 F.4th at 923. Because any responsive documents in the Office of the Special Counsel could not have existed until August 2023 at the earliest, DOJ had no obligation to search for them. And because the cutoff date applies no matter where the documents were stored, the Court need not reach DOJ's alternative argument that OIP was not required to search for documents stored in components outside its authority. Accordingly, the Motion is respectfully **GRANTED** as to the adequacy of DOJ's search.

## II.    FOIA Exemptions

DOJ has asserted exemptions related to (1) portions of eight pages of a chart, subject to Exemptions 5 and 7(A); (2) portions of eight pages of email communications, subject to Exemptions 3, 5, 6, 7(C), and 7(E); and (3) the entirety of a three-page

memorandum, subject to Exemptions 3, 5, 6, 7(C), 7(D), and 7(E).  [Doc. 80 at 19]; *see also* [Doc. 80-1 at 149–56 (chart with redactions), 160–67 (emails with redactions)].

To satisfy its burden of showing that a FOIA exemption applies, an agency may submit affidavits "show[ing], with reasonable specificity, why the documents fall within the exemption."  *Hull v. IRS*, 656 F.3d 1174, 1177 (10th Cir. 2011) (quoting *Quiñon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996)).  A court, in its discretion, may also order the agency to submit documents for *in camera* review, but such review "should not be resorted to as a matter of course."[5]  *Id.* at 1178 (quotation omitted).  "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quotation omitted).  With these principles in mind, the Court proceeds to the individual exemptions asserted by DOJ.

---

[5] In this matter, the Honorable Michael E. Hegarty (Ret.) ordered Defendant to provide an *in camera* declaration regarding the 400 documents that were subject to the *Glomar* response and exemplar documents, [Doc. 42], so that he could adjudicate Plaintiffs' motion under Rule 56(d) for discovery regarding the Government's invocation of a *Glomar* response, *see* [Doc. 33]; Fed. R. Civ. P. 56(d).  In response to Judge Hegarty's June 23, 2023 Order, the Government filed a Declaration and submitted exemplar documents under restriction.  [Doc. 46-1].  As reflected above, the Government later withdrew its *Glomar* response and confirmed it conducted additional searches.  DOJ represented that it "submitted a complete version of the withheld memorandum and email communications to this Court under a Level 2 restriction. . . .  The exemplar pages of the chart in that filing exclude five pages that were produced to Plaintiffs with redactions."  [Doc. 85 at 12 n.3]; *see also* [Doc. 46].  In some instances, while not obligated to do so, this Court has cross-checked DOJ's asserted FOIA exemptions against these unredacted documents to assure itself of the accuracy and appropriateness of Defendant's claimed exemptions.

### A.    Exemption 3:  Materials Exempted by Another Statute

FOIA's Exemption 3 covers "matters that are . . . specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  The exemption only applies if the statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  *Id.*  To carry its burden under Exemption 3, an agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute."  *Larson*, 565 F.3d at 868.  DOJ asserts that four statutes of exemption authorize its withholdings under Exemption 3:  Federal Rule of Criminal Procedure 6(e), the Bank Secrecy Act, the National Security Act of 1947, and the Internal Revenue Code.  The Court addresses each in turn.

***Federal Rule of Criminal Procedure 6(e).***  Subject to limited exceptions, Rule 6(e) prohibits disclosure of "matter[s] occurring before the grand jury."  Fed. R. Crim. P. 6(e)(2)(B).  This prohibition extends to "grand jury records which would tend to reveal some secret aspect of the grand jury's investigation; such matters as the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like."  *Freeman v. Exec. Off. of U.S. Att'ys*, No. 19-cv-00879-CMA-KMT, 2019 WL 6918215, at *4 (D. Colo. Dec. 19, 2019) (cleaned up).  "[W]hen a party seeks documents from an entity whose possession of those documents is directly linked to its role relating to the grand jury investigation, Rule 6(e) bars disclosure because revelation in that particular context would in fact reveal what was before the grand jury."  *Kalbers v. DOJ – U.S. Dep't of Just.*, 166 F.4th 783,

791–92 (9th Cir. 2026) (cleaned up).  Courts have recognized that Rule 6(e) qualifies as a statute of exemption for purposes of Exemption 3.  *See, e.g.*, *Freeman*, 2019 WL 6918215, at *4; *Hodges v. U.S. Att'y Gen.*, No. 07-cv-03076-SAC, 2008 WL 440281, at *1 (D. Kan. Feb. 13, 2008) (citing *Church of Scientology Int'l v. U.S. Dep't of Just.*, 30 F.3d 224 (1st Cir. 1994)).

Based on Rule 6(e), DOJ claims to have withheld federal grand jury information from portions of the email communications and the entirety of the three-page memorandum.  [Doc. 80 at 20].  In support of these withholdings, DOJ has submitted the Declaration of Shannon R. Hammer, the Acting Section Chief of the FBI's Record/Information Dissemination Section.  [*Id.* at 21; Doc. 80-2 at ¶ 1].  Ms. Hammer avers that the withheld materials "contain information about who and when the FGJ [i.e., federal grand jury] subpoenas were issued, what the FGJ subpoenas were targeting, and the documents gathered from the FGJ subpoenas."  [Doc. 80-2 at ¶ 11].  Ms. Hammer further explains that the redacted information indicates when the FGJ investigation was opened, the nature of subpoenaed documents, and other information that would disclose the specific types of documents obtained as a result of the FGJ subpoenas.  [*Id.*].  She also avers that disclosure would reveal the "steps the grand jury took in its investigation."  [*Id.*].

Plaintiffs do not challenge the application of Rule 6(e) and claim not to seek information about any grand jury proceeding.  [Doc. 84 at 32–33].  Upon review of Ms. Hammer's Declaration and the unredacted documents, this Court concludes that DOJ has met its burden as to its assertion of Exemption 3 based on Rule 6(e).

**Bank Secrecy Act.** The Bank Secrecy Act ("BSA") authorizes the Department of the Treasury to prescribe regulations requiring reports of monetary transactions. 31 U.S.C. §§ 5313–5316; [Doc. 80-2 at ¶ 14]. The BSA is intended to assist in combatting money laundering and terrorism financing. § 5311. The statute specifically exempts a BSA "report and records of reports" from disclosure under FOIA. § 5319. Section 5319 of the BSA is a well-established statute of exemption under FOIA's Exemption 3. *See, e.g.*, *Ortiz v. U.S. Dep't of Just.*, 67 F. Supp. 3d 109, 118–19 (D.D.C. 2014) (collecting cases).

DOJ and Ms. Hammer assert that the BSA authorizes withholding of investigative information obtained through the Financial Crimes Enforcement Network ("FinCEN"). [Doc. 80 at 22; Doc. 80-2 at ¶ 16 & n.5]. Specifically, Ms. Hammer avers that portions of email communications and one page of the memorandum contained information "derived and extracted from BSA reports." [Doc. 80-2 at ¶ 16]. Plaintiffs do not dispute that this information would be exempt under the BSA. [Doc. 84 at 32–33]. And numerous courts have approved such withholdings. *See Berger v. IRS*, 487 F. Supp. 2d 482, 496–97 (D.N.J. 2007) (finding that information "derived or extracted" from BSA reports was properly withheld), *aff'd*, 288 F. App'x 829 (3d Cir. 2008); *Council on Am.-Islamic Relations, Cal. v. FBI*, 749 F. Supp. 2d 1104, 1117 (S.D. Cal. 2010) (approving withholding of information obtained from FinCEN and observing that other courts have done the same). The Court concludes that DOJ has properly asserted Exemption 3 as to this information in the withheld email communications.

**National Security Act of 1947.** The National Security Act of 1947 ("NSA") requires the Director of National Intelligence to "protect . . . intelligence sources and

16

methods from unauthorized disclosure." 50 U.S.C. § 3024(h)(1).[6] "[T]he protection afforded to intelligence sources and methods by 50 U.S.C. § 3024[(h)](1) 'is as absolute as possible.'" *Al-Turki*, 157 F. Supp. 3d at 1174 (quoting *CIA v. Sims*, 471 U.S. 159, 175 (1985)). The Supreme Court has recognized this language as an exemption statute under FOIA's Exemption 3. *See Sims*, 471 U.S. at 167–68.

DOJ and Ms. Hammer assert § 3024(h)(1) as a basis for redacting a portion of an email communication. [Doc. 80 at 15; Doc. 80-2 at ¶ 19 & n.6]. Ms. Hammer avers that "the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs." [Doc. 80-2 at ¶ 19]. Plaintiffs do not contest the application of Exemption 3 to protect intelligence sources and methods. [Doc. 85 at 32–33]. The Court's review of Ms. Hammer's Declaration demonstrates that the communication implicates intelligence sources and methods. Thus, DOJ has established that this assertion of Exemption 3 was proper as to the redactions in the email communications.

***Internal Revenue Code.*** Unlike DOJ's first three asserted statutes of exemption, Plaintiffs do object to application of the Internal Revenue Code as a basis for withholding information. [Doc. 84 at 33]. The Internal Revenue Code generally prohibits the Government from "disclos[ing] any return or return information." 26 U.S.C. § 6103(a). The Code defines "return information" "expansively." *Hull*, 656 F.3d at 1183. In pertinent part, "return information" includes

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined

---

[6] This provision was previously codified at 50 U.S.C. § 3024(i)(1).

> or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

§ 6103(b)(2)(A). In other words, "any . . . data" "collected by" the IRS that relates to an individual's potential tax liability constitutes return information under § 6103. The Tenth Circuit has recognized that § 6103 qualifies as an exemption statute for FOIA purposes. *Hull*, 656 F.3d at 1178.

DOJ asserts that it has withheld return information from the memorandum and portions of email chains. [Doc. 80 at 23–24]. To support this assertion, DOJ relies on the Declaration of Carmen M. Banerjee, Senior Division Counsel in the DOJ's Tax Division. [*Id.*; Doc. 80-3 at ¶ 1]. Ms. Banerjee avers that DOJ has withheld information from portions of the memorandum to protect the "scope and nature of the investigation" into a taxpayer, including the taxpayer's identity and the Government's reasoning about potential tax violations. [Doc. 80-3 at ¶ 14(a)]. As for the emails, Ms. Banerjee declares that specified portions have been withheld based on (1) information about a taxpayer's identity and nature and source of income; and (2) discussion of actual or potential tax offenses, including the taxpayer's identity. [*Id.* at ¶ 14(b)].

Plaintiffs counter that "income that was never reported" cannot be "return information." [Doc. 84 at 33]. They cite no statutory basis for this assumption. Rather, they point to *Hull*'s observation that "it does not logically follow that case history notes and information from private parties[/sources] are return information." [*Id.* (quoting *Hull*, 656 F.3d at 1190 (internal quotations omitted))]. Plaintiffs reason that any "amounts of payments" in the documents are "segregable portions" and must be disclosed. [*Id.*].

The Court evaluates Plaintiffs' understanding of "return information" based on the unambiguous text of § 6103(b). *See Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) ("[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning . . . ." (quotation omitted)). "[I]f the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" the Court's inquiry ends there. *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

By its plain text, the Code's definition of return information does not limit itself to information that a taxpayer voluntarily reports on his tax return or other filings. For instance, return information includes a taxpayer's "identify," "the nature, source, or amount of his income," and "payments," without qualifying that such information must have been disclosed by the taxpayer himself. § 6103(b)(2)(A). The next portion of this subsection confirms that return information may be obtained through a wide variety of methods: "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to" potential tax liability or penalties falls within the definition of return information. *Id.* Moreover, the following subsection, § 6103(b)(3), defines "taxpayer return information" to include "return information . . . which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates." Adopting Plaintiffs' understanding of return information as including only reported income would collapse the statutory distinction between "return information" and "taxpayer return information." The Court will not construe subsection (b)(2)(A) in a manner that leaves subsection (b)(3) superfluous. *E.g.*, *Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011) ("[S]tatutes should be read to avoid making any provision superfluous,

19

void, or insignificant." (quotation omitted)).  Because § 6103(b)(2)(A) is unambiguous and harmonious with its surrounding provisions, the Court need not employ any other tools of statutory interpretation.  *Potts*, 908 F.3d at 613.

The Tenth Circuit's decision in *Hull* does not save Plaintiffs' argument.  *Hull* drew on the Fifth Circuit's observation in *Batton v. Evers*, 598 F.3d 169, 178 (5th Cir. 2010), that it does not "logically follow that case history notes and information from private sources contain exclusively third party tax information, rather than segregable portions." *See also Hull*, 656 F.3d at 1189 (quoting this portion of *Batton*).  In *Batton*, a generic reference to "case history notes and information from private sources" was insufficient to establish that the *entirety* of the relevant documents constituted return information.  598 F.3d at 177–78.  The Fifth Circuit emphasized that the agency had not explained why it could not redact (i.e., segregate) the return information and disclose the rest, and that the district court did not conduct an *in camera* review.  *See id*.  In *Hull*, on the other hand, it did "logically follow" that the information a pension plan and its sponsor had submitted to and received from the IRS was return information.  656 F.3d at 1190.  Although FOIA requires an agency to "disclose any reasonably segregable non-exempt information," the Tenth Circuit concluded that "the IRS [had] demonstrated [that] all of the requested information [was] exempt."  *Id.* at 1196.

The facts of this case are readily distinguishable from *Batton*, and *Hull* is simply inapposite.  Unlike *Batton*, the agency here has submitted an affidavit that describes with particularity which redactions cover which types of return information, [Doc. 80-3 at ¶ 14], and the Court has supplemented its review by consulting the unredacted documents.  As for *Hull*, Plaintiffs are correct that *Hull* held information voluntarily submitted to the IRS to

20

be one form of return information.  But nothing in *Hull* suggests that return information can *only* include a "submission made by" the relevant taxpayer.  [Doc. 84 at 33].  As explained, the plain text of § 6103(b)(2)(A) sweeps more broadly.  Thus, the Court finds that the withheld portions in this case contain non-segregable return information related to taxpayer identity, nature and source of income, and potential liability.  *See Goldstein v. Treasury Inspector Gen. for Tax Admin.*, 278 F. Supp. 3d 131, 144 n.3 (D.D.C. 2017) ("[T]o the extent the investigative files contain information that would reveal the identity or existence of an investigation of a taxpayer as to whom [p]laintiff cannot perfect a records request, such information qualifies as 'return information' that cannot  be  disclosed  under [§ 6103].").

Accordingly, the Court respectfully concludes that DOJ has established that this assertion of Exemption 3 was proper.  The Motion is **GRANTED** as to DOJ's Exemption 3 withholdings under Rule 6(e), the BSA, the NSA, and the Internal Revenue Code.

## B.    Exemption 5:  Attorney Work Product

DOJ asserts that the entirety of the three-page memorandum[7] and portions of the emails and chart pages may be withheld under Exemption 5. [Doc. 80 at 24].  Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  The first  component  of  this  exemption  is  "no  less  important  than  the  second;  the communication must be 'inter-agency or intra-agency.'" *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) (quoting § 552(b)(5)).  As an initial matter,

---

[7] While the Court has concluded that the entirety of the three-page memorandum is already exempted pursuant to Exemption 3 based on Rule 6(e), this Court proceeds to consider this alternate basis for the purpose of completeness.

the Court concludes that the requested records easily meet this first requirement.  The

emails and memorandum were created and stored within DOJ.  [Doc. 80-1 at ¶¶ 37, 40].

The charts were compiled by DOJ's Executive Office for United States Attorneys

("EOUSA") and transmitted to the "then-incoming [Presidential] administration's transition

team."  [*Id.* at ¶ 35].  Plaintiffs do not dispute that the first component of Exemption 5 is

satisfied.  [Doc. 84 at 33].

The second component of Exemption 5 incorporates civil discovery privileges,

including the attorney work-product privilege.  *Klamath*, 532 U.S. at 8.  The work-product

privilege shields materials prepared in anticipation of litigation or trial by or for a party or

its representatives.  *See Frontier Refin., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 703

(10th Cir. 1998) (citing Fed. R. Civ. P. 26(b)(3)).  "At its core, the work-product doctrine

shelters the mental processes of the attorney, providing a privileged area within which he

can analyze and prepare his client's case."  *United States v. Nobles*, 422 U.S. 225, 238

(1975).

Work product may be either opinion or factual.  *In re Qwest Commc'ns Int'l Inc.*,

450 F.3d 1179, 1186 (10th Cir. 2006).  Opinion work product includes an attorney's

"mental impressions, conclusions, opinions, or legal theories," Fed. R. Civ. P. 26(b)(3)(B),

and is entitled to "special protection," *Qwest*, 450 F.3d at 1186 (citing Fed. R. Civ. P.

26(b)(3)); *see also Frontier Refin.*, 136 F.3d at 704 n.12 ("Some courts have held that

opinion work product is absolutely protected; others have concluded it may be discovered

under compelling circumstances." (collecting cases)).  Fact work product, on the other

hand, may be obtained if a party "shows that it has substantial need for the materials to

prepare its case and cannot, without undue hardship, obtain their substantial equivalent

by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Before the Court can apply the work-product privilege, it must determine whether the two types of work product should be treated differently for FOIA purposes.

### 1.    Opinion Work Product Versus Fact Work Product

DOJ urges the Court to apply persuasive authority holding that, for purposes Exemption 5, the work product doctrine "does not distinguish between factual and deliberative [i.e., opinion] material."  [Doc. 80 at 25 (first quoting *Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005); and then citing *Raytheon Aircraft Co. v. U.S. Army Corps. of Eng'rs*, 183 F. Supp. 2d 1280, 1291–92 (D. Kan. 2001))].  This approach originates from the D.C. Circuit.  *See Martin v. Off. of Special Couns.*, 819 F.2d 1181, 1187 (D.C. Cir. 1987).  Plaintiffs do not address this issue.

Under the D.C. Circuit's approach, "factual material is itself privileged when it appears within documents that are attorney work product.  If a document is fully protected as work product, then segregability is not required."  *Jud. Watch*, 432 F.3d at 371.  Numerous circuits have followed the D.C. Circuit and held that Exemption 5 applies equally to fact and opinion work product.[8]  To be sure, the Tenth Circuit has not yet weighed in on this issue, and some district courts in this Circuit have held that "Exemption

---

[8] *See, e.g.*, *ACLU of N. Cal. v. U.S. Dep't of Just.*, 880 F.3d 473, 488 (9th Cir. 2018) ("[I]f a document is covered by the attorney work-product privilege, the government need not segregate and disclose its factual contents." (quotation omitted)); *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1263 (11th Cir. 2008) ("Factual attorney work product enjoys sweeping exemption protection because it is not routinely or normally discoverable through civil discovery . . . ." (quotation omitted)); *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 292–93 (4th Cir. 2004) ("The attorney work product exemption includes factual information prepared by an attorney in anticipation of litigation."); *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 147 (2d Cir. 1994) (endorsing D.C. Circuit approach); *Norwood v. FAA*, 993 F.2d 570, 576 (6th Cir. 1993) (same).

5 permits the segregation and release of purely factual material from attorney work-product." *Fine v. U.S. Dep't of Energy, Off. of Inspector Gen.*, 830 F. Supp. 570, 575 (D.N.M. 1993); *see also PacifiCorp v. U.S. EPA*, No. 13-cv-02187-RM-CBS, 2014 WL 87509, at *6 (D. Colo. Jan. 8, 2014) (following *Fine*).   But dicta in the Supreme Court's decision in *FTC v. Grolier Inc.* strongly suggests that the approach pressed by DOJ is correct:

> The test under Exemption 5 is whether the documents would be "routinely" or "normally" disclosed upon a showing of relevance. . . .   Under the current state of the law relating to the privilege, work-product materials are immune from discovery unless the one seeking discovery can show substantial need in connection with subsequent litigation.   Such materials are thus not "routinely" or "normally" available to parties in litigation and hence are exempt under Exemption 5.

462 U.S. 19, 26–27 (1983) (internal citation omitted).   Neither Exemption 5 nor Rule 26(b)(3) have been substantively amended since *Grolier* was decided.

In light of *Grolier* and the weight of persuasive authority, the Court concludes that both fact and opinion work product are exempt under Exemption 5.   The Court will not consider whether fact work product is segregable from opinion work product in the records at issue.

### 2.    Anticipation of Litigation

Because there is no dispute that the requested records were created by DOJ attorneys or representatives, the remaining question is whether these records were assembled "in preparation for impending litigation." *United States v. Ary*, 518 F.3d 775, 783 (10th Cir. 2008) (quotation omitted).   The "central inquiry in resolving work product questions" is "whether anticipated litigation is the driving force behind the preparation of each requested document." *Wikel v. Wal-Mart Stores, Inc.*, 197 F.R.D. 493, 496 (N.D.

24

Okla. 2000); *see also* 8 Wright & Miller's Federal Practice & Procedure § 2024 (3d ed., Sept. 2025 update) ("[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." (emphasis added)). The work-product privilege does not protect "[m]aterials assembled in the ordinary course of business or for other non-litigation purposes." *Kannady v. Ball*, 292 F.R.D. 640, 649 (D. Kan. 2013) (quotation omitted). Nor does it apply "automatically to any and all investigations undertaken by government agencies." *SEC v. Goldstone*, 301 F.R.D. 593, 665 (D.N.M. 2014) (quotation omitted). "Many times, however, investigation by a federal agency presents more than a remote prospect of future litigation, and provides reasonable grounds for anticipating litigation sufficient to trigger application of the work product doctrine." *Id.* (cleaned up).

*Charts.* Beginning with the chart pages, DOJ asserts that chart is work product because it contains "undisclosed details, evidence, and internal impressions of Department attorneys regarding pending investigative and prosecutorial matters, prepared in the course of attorneys carrying out prosecutorial-related duties." [Doc. 80 at 26 (quoting [Doc. 80-1 at ¶ 36])]. Ms. Brinkmann avers that the "stated purpose" of the charts was to provide "brief descriptions of significant non-public matters to the then-incoming administration's transition team, for their situational awareness." [Doc. 80-1 at ¶ 35].

The Court respectfully disagrees that the chart was prepared in anticipation of litigation. Tellingly, Ms. Brinkmann does not try to claim that the chart was prepared in anticipation of litigation—she merely asserts that the chart was "prepared in the course

25

of attorneys carrying out prosecutorial-related duties." [*Id.* at ¶ 36]. But not all prosecutorial-related duties necessarily constitute "preparation for impending litigation." *Ary*, 518 F.3d at 783. And although the chart may discuss matters in which litigation was anticipated, that does not demonstrate that preparation for impending litigation was the driving force behind the chart's creation. Rather, it appears that the motivation for compiling the chart was the transition between presidential administrations, not any upcoming litigation. In this context, promoting the general "situational awareness" of a "transition team" can only be characterized as a non-litigation purpose. [Doc. 80-1 at ¶ 36]. The work-product privilege is not intended to protect such a document. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Proper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."). Accordingly, DOJ has failed to carry its burden of demonstrating that the chart is work product entitled to protection under Exemption 5.

**Emails and Memorandum.** The Court readily concludes, however, that the emails and memorandum qualify as work product. They reflect coordination between DOJ attorneys regarding the substance and strategy of the investigation. *See* [Doc. 80-1 at ¶¶ 38, 41]. They contemplate possible charges and legal theories. The memorandum in particular sets out DOJ's putative theory of the case in detail. Such materials sit in the heartland of the work-product privilege. *See Nobles*, 422 U.S. at 238. Plaintiffs do not dispute this conclusion. [Doc. 84 at 33]. DOJ has thus met its burden as to this assertion of Exemption 5.

### 3.    Crime-Fraud Exception

Although Plaintiffs do not contest that the email portions and memorandum constitute work product, they argue that these records should nevertheless be disclosed under the crime-fraud exception.  [Doc. 84 at 23–25, 33].  Plaintiffs argue that because DOJ engaged in "wrongdoing . . . in connection with the Biden investigation," work product produced during the investigation cannot be privileged.  [*Id.* at 23–24].  DOJ replies that the crime-fraud exception does not apply because the requested records were not made "in furtherance of criminal or fraudulent conduct."  [Doc. 85 at 12].

The crime-fraud exception to the work-product privilege "applies upon a showing that a client consulted with an attorney in furtherance of a crime or fraud."  *Goldstone*, 301 F.R.D. at 652 (citing *In re Grand Jury Proceedings (Vargas)*, 723 F.2d 1461, 1467 (10th Cir. 1983)) (further citations omitted).  "Before the privilege is lost there must be prima facie evidence that the allegation of attorney participation in a crime or fraud has some foundation in fact."  *Vargas*, 723 F.2d at 1467 (cleaned up).  Where, as here, the attorney-client relationship did not have an unlawful purpose at its inception, then all relevant work product materials "are potentially privileged except those that are germane to some criminal or fraudulent goal."  *Chevron Corp. v. Snaider*, 78 F. Supp. 3d 1327, 1336 (D. Colo. 2015) (citing *White v. Am. Airlines, Inc.*, 915 F.2d 1414, 1423 (10th Cir. 1990)).  In other words, the party seeking to pierce the privilege "must also show that 'the purpose of the communication was to further crime or an intended fraud.'"  *Id.* (quoting *In re Grand Jury Proceedings (Company X)*, 857 F.2d 710, 713 (10th Cir. 1988)).

Even assuming that the DOJ conduct detailed in Plaintiffs' response and the Weiss Report can trigger the crime-fraud exception,[9] the Court agrees with DOJ that Plaintiffs have not presented prima facie evidence that the requested records were intended to further a crime or fraud.  Plaintiffs primarily object to DOJ's "refusal to pursue" certain recommended charges against Hunter Biden, as well as "potentially unethical coordination between attorneys for Hunter Biden and Biden Justice Department lawyers during the special counsel investigation."  [Doc. 84 at 23–24 (quotation omitted)].  But the emails and memorandum were all generated in 2019—during the first Trump Administration and before the special counsel investigation.  *See* [Doc. 80-1 at 160–67 (email timestamps between February and December of 2019); Doc. 46-1 at 19 (separate email communication suggesting the memorandum was prepared in May 2019 at the latest)].  More importantly, the relevant records all relate to the early stages of the investigation and do not reflect any charging decisions or "coordination" between DOJ lawyers and Hunter Biden's representatives.  Thus, Plaintiffs have failed to show that "the purpose of the communication[s] was to further crime or an intended fraud."  *Company X*, 857 F.2d at 713.

The Court respectfully concludes that the crime-fraud exception does not apply and that the emails and memorandum are subject to the work-product privilege.  In sum, the Motion is respectfully **GRANTED** as to DOJ's withholding of the email portions and

---

[9] Plaintiffs appear to argue that DOJ's conduct was unjust or unethical rather than criminal or fraudulent.  [Doc. 84 at 23–24 & n.3].  Given that the Tenth Circuit has declined to extend the crime-fraud exception to tortious conduct, the Court doubts that this conduct would qualify for the exception.  *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551–52 (10th Cir. 1995).  But because Plaintiffs fail to show that the requested records were prepared in furtherance of the alleged misconduct, the Court need not decide this issue.

memorandum under Exemption 5, and **DENIED** as to DOJ's withholding of the chart pages under Exemption 5.  Having now found that Exemptions 3 and 5 justify withholding the memorandum in its entirety, the Court limits the remainder of its analysis to the chart and the relevant email portions.

### C.    Exemption 7:  Law Enforcement Materials

#### 1.    Law Enforcement Purpose

FOIA's Exemption 7 applies to "records or information compiled for law enforcement purposes," provided that the materials fall into one of six categories, which the Court refers to as Exemptions 7(A) through 7(F).  5 U.S.C. § 552(b)(7).  "[T]he threshold inquiry under this exemption is whether the agency compiled the withheld information for a law enforcement purpose."  *Friends of Animals*, 15 F.4th at 1262.  DOJ urges the Court to apply the "per se rule," in which all records compiled by an "agency . . . whose primary function is law enforcement" are considered to be "compiled for law enforcement purposes" under Exemption 7.  *See Jordan v. U.S. Dep't of Just.*, 668 F.3d 1188, 1197 (10th Cir. 2011); [Doc. 80 at 27–28].  DOJ argues that it is such an agency, because one of its "core functions" is "the enforcement of federal law."  [Doc. 80 at 28].  As support, DOJ cites to several statutes authorizing it to represent the United States in various litigation proceedings.  [*Id.* (citing 28 U.S.C. §§ 515, 516, 519)].

The Court respectfully declines to hold that DOJ, in its entirety, is a law enforcement agency.  Under the per se rule, such a holding would mean that any document compiled by any DOJ component has a law enforcement purpose.  *Jordan*, 668 F.3d at 1197.  But DOJ contains numerous components that perform different functions.    *See*    28    C.F.R.    §    0.1;    *Agencies*,    Dep't    of    Just.,

29

https://www.justice.gov/agencies/chart/map (last visited March 27, 2026).  To be sure, many components—such as the FBI—are undoubtedly law enforcement agencies. Others, such as the Office of Legislative Affairs, do not appear to perform primarily law enforcement functions.  *See* 28 C.F.R. § 0.27; *About the Office of Legislative Affairs*, Dep't of Just., https://www.justice.gov/ola/about-ola (last visited March 27, 2026).  This Court will not paint DOJ's various subdivisions with such a broad brush.

*Jordan* itself supports this conclusion.  There, the Tenth Circuit undertook an individualized analysis of another DOJ component, the Bureau of Prisons ("BOP"), to conclude that BOP's primary function is law enforcement.  668 F.3d at 1195.  The court considered the authority assigned to BOP by statute and the tasks and duties performed by BOP officers.  *See id.*  That analysis would have been unnecessary if one DOJ component could simply invoke its membership in DOJ as a whole and ride the coattails of other components that perform obvious law enforcement functions.  Other courts have similarly considered Exemption 7 on a component-by-component basis.  *See, e.g.*, *Elec. Priv. Info. Ctr. v. Dep't of Just. Crim. Div.*, 82 F. Supp. 3d 307, 317–18 (D.D.C. 2015) (concluding, based on D.C. Circuit's "rational nexus test," that withheld records were "quite obviously related to" the FBI's and the DOJ Criminal Division's "law enforcement duties"); *United for FBI Integrity v. U.S. Dep't of Just.*, No. 22-cv-02885-RC, 2024 WL 961001, at *9 (D.D.C. Mar. 6, 2024) (declining to apply Exemption 7 to all records compiled by DOJ's Office of Inspector General ("OIG"), because OIG is a "mixed function agency"); *Jefferson v. Dep't of Just., Off. of Prof. Resp.*, 284 F.3d 172, 179 (D.C. Cir. 2002) (remanding district court's application of Exemption 7 to all records compiled by DOJ's Office of Professional Responsibility ("OPR") where DOJ regulations "describe[d]

OPR as a mixed function agency," so it was not clear that "all OPR records are necessarily law enforcement records").  The Court thus turns to whether the specific documents at issue, as compiled by their respective DOJ components, were compiled for a law enforcement purpose.

*Emails.*  With respect to the emails, the Court need not consider whether the DOJ components involved are primarily law enforcement agencies.  On their face, the emails were created during and in furtherance of a criminal investigation.  Even assuming that the various DOJ components represented in these records are mixed function agencies, the records plainly fell within those components' law enforcement functions and were "use[d] . . . to enforce the law." *Friends of Animals*, 15 F.4th at 1268.

*Chart Pages.*  The redactions of responsive entries on the chart pages require a more particularized analysis.[10]  Ms. Brinkmann declares that the charts were compiled by EOUSA, based on information provided by various United States Attorneys.  [Doc. 80-1 at ¶ 35].  Under *Jordan*, Court's first task is to determine whether EOUSA is covered by the per se rule.  That depends on whether EOUSA is an agency "whose primary function is law enforcement" or a mixed function agency.  *Jordan*, 668 F.3d at 1197.  In this context, "law enforcement" is not just limited to investigations, prosecutions, enforcement proceedings.  *See id.* at 1194 n.2 ("Exemption 7 . . . applies to internal agency materials even when the materials have not been compiled in the course of a specific investigation." (cleaned up)).  Rather, an agency's law enforcement functions may include training of law

---

[10] A significant portion of the redactions to the chart pages pertain to nonresponsive matters.  *See, e.g.*, [Doc. 80-1 at 149].  The Court does not consider Defendant's argument that "Exemptions 5 and/or 7(A) would be expected to be applicable to nonresponsive matters in this chart," [*id.*], because nonresponsive information fall outside of this Court's review in this instant matter.

enforcement officers; crime prevention and security measures; and verifying compliance with the law. *See, e.g.*, *Grey v. Alfonso-Royals*, 140 F.4th 173, 178 (4th Cir. 2025) ("Training officers how to enforce the law is a law enforcement purpose." (quotation omitted)); *Milner*, 562 U.S. at 582 (Alito, J., concurring) ("[L]aw enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security."); *Friends of Animals*, 15 F.4th at 1269 ("Verifying compliance with the law and preventing illegal activity is . . . a part of law enforcement.").

Following *Jordan*'s lead, the Court considers the functions of the EOUSA based on the duties assigned to it by applicable regulations and the DOJ's Justice Manual, which sets out DOJ's internal "policies and procedures." *See Jordan*, 668 F.3d at 1195 (assessing agency's primary function based on statutory duties and authorities assigned to agency and its officers); U.S. Dep't of Just., Just. Manual, § 1.100 (2026). The relevant regulations and Justice Manual provisions demonstrate that EOUSA is a mixed function agency. By regulation, EOUSA's general functions primarily entail administrative and executive support to the U.S. Attorney's offices and other DOJ components. 28 C.F.R. § 0.22; *accord* Just. Manual § 3-1.120. Those duties include coordination and evaluation of the U.S. Attorneys' offices; publication of the Justice Manual; supervision of the training operations of the Office of Legal Education; and support for the Attorney General's Advisory Committee of United States Attorneys. *Id.* EOUSA is also charged with "the establishment of policy and procedures and other appropriate action" for recovery of monetary criminal sanctions. 28 C.F.R. § 0.171(c). The Justice Manual tasks EOUSA with various other administrative functions on behalf of U.S. Attorneys' offices, such as overseeing finances and approving expenditures, Just. Manual §§ 3-8.100, 3-8.130, 3-

32

8.550; acquisition and management of facilities, *id.* §§ 3-14.000 to 3.14.200; and management of data and information technology, *id.* at §§ 3-16.000 to 3-16.130.

To be sure, some of these duties—such as EOUSA's role in training DOJ lawyers and promulgating rules for the collection of monetary sanctions—may be fairly characterized as law enforcement functions. And while even EOUSA's administrative functions could be said to indirectly support the law enforcement activities performed by U.S. Attorneys' offices, EOUSA's work includes tasks that are highly attenuated from prevention, detection, or prosecution of unlawful conduct. *See Milner*, 562 U.S. at 582–83 (Alito, J., concurring). For instance, EOUSA's roles in budget oversight and space procurement are far removed from the BOP functions in *Jordan* that included making arrests, seizing contraband, and performing searches. 668 F.3d at 1195. Given the significant administrative functions within EOUSA's duties, the Court cannot conclude that EOUSA is an agency whose primary function is law enforcement. *Cf. Friends of Animals*, 15 F.4th at 1260 (FOIA exemptions must be construed narrowly). Accordingly, the Court concludes that EOUSA is a mixed function agency for purposes of Exemption 7.

Because EOUSA is a mixed function agency, the Court cannot apply the per se rule and must return to the initial question of whether EOUSA compiled the chart pages for a law enforcement purpose. The Tenth Circuit has "never identified the precise burden required for a mixed-function agency to prove that certain information was compiled for a law enforcement purpose." *Friends of Animals*, 15 F.4th at 1268. In *Friends of Animals*, the Tenth Circuit applied one party's unopposed suggestion that the test could be "(1) the information was collected by an office that enforces federal law, and (2) the office uses that information to enforce the law." *Id.* The court observed that "this test is consistent

33

with the exemption's language," but it did not necessarily hold that such a test was the only possible formulation that would satisfy Exemption 7.  *See id.*  Other circuits, the Tenth Circuit explained, have held that a mixed function agency may invoke Exemption 7 if it can "demonstrate that it had a purpose falling within its sphere of enforcement authority in compiling the particular document."  *Id.* at 1268 n.10 (quotation omitted).  Although this Court is informed by the *Friends of Animals* test, the Court is mindful that Exemption 7 ultimately focuses on the *purpose* behind a document, not whether the agency actually *uses* the document for law enforcement.  5 U.S.C. § 552(b)(7); *see also, e.g.*, *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Serv.*, 30 F.4th 318, 328 (2d Cir. 2022) ("The threshold inquiry under Exemption 7 is the reason for which material was compiled.").

Here, Defendant submitted an *in camera* and *ex parte* declaration to support the assertion of Exemption 7(A) that provides details of the law enforcement investigation. [Doc. 79 at 2].  The Court has reviewed that *in camera* and *ex parte* declaration, as well as an unredacted version of the charts submitted to the Court in conjunction with Plaintiffs' Rule 56(d) Motion, and the Court concludes that the charts at issue ultimately had a law enforcement purpose, i.e., to provide "brief descriptions of significant non-public matters to the then-incoming administration's transition team, for their situational awareness." [Doc. 80-1 at ¶ 35].  While the charts were compiled pursuant to EOUSA's executive functions of consolidating information from various U.S. Attorneys' offices and acting as a liaison on behalf of those offices, *see* Just. Manual §§ 3-1.120, 3-16.100, 3-16.130, the Court concludes that the intent of the chart was to allow the incoming administration's

transition team to understand, and in turn make decisions regarding, ongoing law enforcement investigations. This qualifies as a law enforcement purpose.[11]

Because all relevant documents satisfy Exemption 7's threshold requirement, the Court turns to the individual exemptions that DOJ has asserted under Exemption 7.

### 2.    Exemption 7(A):  Interference with Enforcement Proceedings

DOJ asserts Exemption 7(A) as to portions of the chart.  [Doc. 80-2 at ¶ 30 & n.13]. This exemption applies to information that "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(7)(A).  Exemption 7(A) only applies if the withheld material "relates to a 'concrete prospective law enforcement proceeding.'" *Juarez v. Dep't of Just.*, 518 F.3d 54, 59 (D.C. Cir. 2008) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978)).  But "so long as the investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release of that evidence, Exemption 7(A) applies."  *Id.*  Courts "give deference to an agency's predictive judgment of the harm that will result from disclosure of information," but the agency still must explain how disclosure will interfere with enforcement proceedings.  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1098 (D.C. Cir. 2014).

Ms. Hammer avers that the information in the chart relates to "separate non-public ongoing investigations unaffected by the pardon of Hunter Biden."  [Doc. 80-2 at ¶ 30]. She also asserts that the release of non-public information in the chart would reveal the

---

[11] While Plaintiffs question "why DOJ informed Joe Biden's transition team and Hunter Biden's representatives about a planned interview and search of a storage locker," [Doc. 84 at 26], the charts bear no indicia that they were shared beyond the transition team described in Ms. Hammer's Declaration.

subjects of these investigations and the Government's "investigation/enforcement strategies in these ongoing matters." [*Id.*].  Ms. Hammer's Declaration is confirmed by the *ex parte* materials submitted by DOJ.  And because the withheld information relates to subjects of an ongoing, non-public investigation, the Court finds that the likelihood of interference is "readily apparent." *Citizens for Resp.*, 746 F.3d at 1098.  DOJ has met its burden as to Exemption 7(A), and the Motion is respectfully **GRANTED** as to this exemption.

### 3.    Exemption 7(E):  Investigative Techniques and Procedures

DOJ seeks to assert Exemption 7(E) over portions of the emails.  [Doc. 80 at 29; Doc. 80-2 at ¶¶ 40 n.15, 41 n.16, 45 n.17].  Exemption 7(E) covers information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  In general, this exemption applies only to techniques and procedures "generally unknown to the public."  *Hale v. U.S. Dep't of Just.*, 973 F.2d 894, 902 (10th Cir. 1992) (quotation omitted), *overruled in part on other grounds*, 2 F.3d 1055 (10th Cir. 1993).  But techniques and procedures "known to the public to some extent" may be exempted if "disclosure of the circumstances of their use could lessen their effectiveness." *Id.* at 903.  The risk-of-circumvention requirement is a "relatively low bar" that requires the agency to show that "release of a document might increase the risk that a law will be violated or that past violators will escape legal consequences."[12]  *Pub. Emps. for Env't*

---

[12] There is a circuit split, not yet addressed by the Tenth Circuit, over whether the risk-of-circumvention requirement applies only to the "guidelines" clause of Exemption 7(E) or if it applies to "techniques and procedures" as well.  *See Broward Bulldog, Inc. v. U.S. Dep't*

*Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 (D.C. Cir. 2014) (Kavanaugh, J.) (quotation omitted).

Relying on Ms. Hammer's Declaration, DOJ argues that Exemption 7(E) applies to "the methods the FBI uses to collect and analyze information obtained for investigative purposes." [Doc. 80 at 30 (quoting [Doc. 80-2 at ¶ 40])]. Ms. Hammer explains that if the techniques used in this case were disclosed, criminal suspects would learn about the "circumstances under which the specific techniques were used or requested and the usefulness of the information obtained." [Doc. 80-2 at ¶ 40]. That information would enable them to take countermeasures to circumvent these techniques. [*Id.*].

Plaintiffs only object to this exemption as it relates to "payment amounts," "from whom," and "when." [Doc. 84 at 34]. Plaintiffs also appear to implicitly attack the risk-of-circumvention requirement by arguing that disclosure of the requested information could not "tip off other 'criminal elements'" based on the report of Special Counsel David Weiss. [*Id.*]. In reply, DOJ argues that it has only asserted this exemption as to records describing "protectable techniques" or information "so intertwined with exempt information" that reasonable segregation was impossible. [Doc. 85 at 13].

Upon review of information regarding the amount and circumstances of payments, the Court concludes that this information directly relates to DOJ's procedures and targeting priorities for reviewing voluminous financial records obtained under the BSA.

---

*of Just.*, 939 F.3d 1164, 1194 (11th Cir. 2019) (summarizing circuit split); *see also, e.g.*, *Al-Turki*, 175 F. Supp. 3d at 1198–99 (concluding that "techniques and procedures" are not subject to risk-of-circumvention requirement). But the risk-of-circumvention requirement is a "low bar," so "it is not clear that the difference matters much in practice." *Pub. Emps.*, 740 F.3d at 204 n.4. Because DOJ can satisfy the risk-of-circumvention requirement, the Court need not decide this issue.

*See* [Doc. 80-2 at ¶¶ 44–45]; *Broward Bulldog, Inc. v. U.S. Dep't of Just.*, 939 F.3d 1164, 1192 (11th Cir. 2019) ("[A] choice to focus on a particular slice of [a larger set of] data directly reveals a targeting priority, and indirectly reveals the methodologies and data used to make that selection." (quoting *ACLU of Mich. v. FBI*, 734 F.3d 460, 466 (6th Cir. 2013)). Nor is the payment information segregable from the discussion of investigative procedures and techniques used. For the information that has been properly withheld, the Court finds that Ms. Hammer's Declaration explains with reasonable specificity why disclosure of the techniques and procedures used in this type of investigation would create a risk of circumvention. The Motion is respectfully **GRANTED** as to Exemption 7(E).

### D.      Exemptions 6 and 7(C):  Invasion of Privacy

Like the Parties, the Court will address Exemptions 6 and 7(C) together. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) applies to law enforcement files whose disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C). Both exemptions require a privacy inquiry that is "largely the same," although Exemption 7(C) is broader. *Friends of Animals*, 15 F.4th at 1261; *see also U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989) (observing that the two exemptions have "comparable language" but Exemption 7(C)'s protection is "broader"). Under either exemption, the Court must balance the public interest in disclosure against the relevant privacy interest. *See Friends of Animals*, 15 F.4th at 1261.

Here, DOJ seeks to apply Exemptions 6 and 7(C) to portions of the emails and the chart.  [Doc. 80-2 at ¶¶ 25 n.11, 28 n.12].  DOJ submits that the Court need only apply Exemption 7(C) because all relevant records are law enforcement records.  [Doc. 80 at 32].  This Court concurs, and its analysis focuses on whether Exemption 7(C) appropriately applies to the withheld information.

Pursuant to Exemption 7(C), DOJ seeks to withhold "the names and identifying information of third parties not identified in Plaintiffs' FOIA request." [13]  [*Id.*].  The Tenth Circuit has prescribed a three-part test to determine whether Exemption 7(C) applies:  "(1) the information must have been gathered for a law enforcement purpose; (2) there must be a personal privacy interest at stake; and, if so, (3) the privacy interest must outweigh the public interest in disclosure."  *Friends of Animals*, 15 F.4th at 1261.  The Court has already concluded that the emails and chart were compiled for a law enforcement purpose, so the Court limits its inquiry to the second two prongs.

The pertinent privacy interest generally entails "avoiding disclosure of personal matters" and an "individual's control of information concerning his or her person."  *Reps. Comm.*, 489 U.S. at 762–63 (quotation omitted).  In the law enforcement context, Exemption 7(C) "recognizes the strong interest that suspects, witnesses, or investigators have in not being associated unwarrantedly with alleged criminal activity."  *Al-Turki*, 175 F. Supp. 3d at 1178 (cleaned up) (quoting *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir.

---

[13] The redactions on the emails indicate that DOJ has asserted Exemption 6 as to the email addresses and phone numbers of certain DOJ employees.  [Doc. 80-1 at 160–63, 165].  These redactions do not appear to be challenged by Plaintiffs.  *See* [Doc. 84 at 15]. In other instances, the redactions are covered by other exemptions found applicable by the Court.  Therefore, the Court considers only the portions of the emails as revealed in the unredacted submission, [Doc. 46-1], that are not otherwise exempt from disclosure on other separate grounds.

2000)).  The public interest at stake is "the public's interest in obtaining information likely to contribute to its understanding of an agency's performance of its duties."  *Friends of Animals*, 15 F.4th at 1265 (quotation omitted).

DOJ asserts that disclosing the names and identifying information of third parties does not serve the public interest and could subject those individuals to harassment or embarrassment.  [Doc. 80 at 32].  With respect to an individual who provided information to the FBI, Ms. Hammer avers that disclosure of this individual's identity could subject the individual to embarrassment, harassment, and retaliation.  [Doc. 80-2 at ¶¶ 25–26].  Ms. Hammer and DOJ also claim that disclosure of this information "would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI."  [*Id.* at ¶ 27; Doc. 80 at 32–33].  As for individuals who were subjects of investigative interest, Ms. Hammer avers that "[b]eing identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma" that could "result in professional and social repercussions."  [Doc. 80-2 at ¶ 28].  She also asserts that these individuals, who are not Hunter Biden or James Biden, "maintain substantial privacy interests in not having their identities disclosed."  [*Id.*].  Plaintiffs note that they do not object to redacting information that would identify third-party informants, although they argue that the Bidens' privacy interests are minimal and outweighed by the public interest in information about the investigation.  [Doc. 84 at 35].

The Court finds that DOJ has met its burden as to Exemption 7(C).  Insofar as information regarding third parties is reflected in the emails, the Court agrees with DOJ that the material at issue identifies third parties who assisted with or are subject to an investigation but "reveals little or nothing about [FBI and DOJ's] own conduct."  *Reps.*

40

*Comm.*, 489 U.S. at 773; *see also*, *e.g.*, *Watters v. Dep't of Just.*, 576 F. App'x 718, 724 (10th Cir. 2014) (approving application of Exemptions 6 and 7(C) to the "names and identifying information of law enforcement officers and other third parties" who provided information or were subjects of "investigative interest"). The privacy interest outweighs any public interest in this scenario.

The Motion is respectfully **GRANTED** as to Exemption 7(C).[14] The Court need not reach Exemption 6.

## III.    Public-Domain Doctrine

Notwithstanding these exemptions, Plaintiffs ask the Court to apply FOIA's public domain exception and order disclosure of the relevant documents. [Doc. 84 at 21–22 (citing *Marino v. DEA*, 685 F.3d 1076, 1080 (D.C. Cir. 2012))]. The Tenth Circuit has described the public domain doctrine as follows:

> The public domain doctrine, a doctrine applied by the D.C. Circuit, comes into play once a court has concluded that a record falls within an exemption to disclosure under FOIA. It allows a court, in certain circumstances, to disregard that otherwise applicable exemption based on a prior public release *of the requested materials*.

*Prison Legal News v. Exec. Off. for U.S. Att'ys*, 628 F.3d 1243, 1252 (10th Cir. 2011) (emphasis added) (citing *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)). In *Prison Legal News*, the Tenth Circuit expressly declined to adopt the public domain doctrine at that juncture. *See id.* at 1253.

---

[14] Having concluded that all responsive portions of the chart may be withheld under Exemption 7(A) and that information identifying a third-party informant may be additionally withheld under Exemption 7(C), the Court need not address whether that same identifying information would also be covered by Exemption 7(D). *See* [Doc. 80 at 29 & n.6].

Plaintiffs argue that because many of the details surrounding the investigation of Hunter Biden have been publicly disclosed, DOJ should also be required to "documents related to those topics." [Doc. 84 at 22]. As DOJ points out, though, this argument overstates the scope of the public domain doctrine. [Doc. 85 at 11]. The public domain doctrine applies only when a plaintiff carries its burden of "pointing to specific information in the public domain that appears to duplicate that being withheld." *Assassination Archives & Rsch. Ctr. v. CIA*, 334 F.3d 55, 59 (D.C. Cir. 2003) (quotation omitted). A previous disclosure "appears to duplicate" the requested records if it is "as specific as" and "matches" the sought material. *Id.* at 60 (cleaned up); *see also Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.").

Plaintiffs have not made such a showing here. They are correct that many of the basic facts of Hunter Biden's conduct and DOJ's charging decisions have been disclosed, especially in the report of Special Counsel David Weiss. [Doc. 85 at 21–22]; *see also* David C. Weiss, Report on the Investigation into the Criminal Conduct of Robert Hunter Biden (2025). But upon review of the Weiss Report and other materials[15] submitted by Plaintiffs, the Court is respectfully unpersuaded that this information is as specific as or matches the documents at issue. The requested records contain various internal details of FBI's and DOJ's investigation that are not disclosed in Plaintiffs' submissions. For

---

[15] These materials are set out in an earlier section of Plaintiffs' response brief. *See* [Doc. 84 at 17]. Plaintiffs generally refer to news articles, although they also reference a press release describing a congressional committee's investigation. *See* [*id.*]; Press Release, Committee on Oversight and Government Reform, Comer Releases Third Bank Memo Detailing Payments to the Bidens from Russia, Kazakhstan, and Ukraine (Aug. 9, 2023).

example, the records include descriptions of investigative techniques, attorney work product assessing the case, identities of confidential sources and persons of interest, and specific financial records.  Plaintiffs have not demonstrated that this information appears to be duplicated in the public record.  *See Assassination Archives*, 334 F.3d at 59. Indeed, Plaintiffs implicitly concede that their principal object in this case—the amounts and circumstances of certain payments to Hunter Biden—has not yet been publicly disclosed.  *See* [Doc. 84 at 22 ("The public has a right to know who made the payments and when.")].

Because Plaintiffs fail to show that the specific information requested has already been publicly disclosed, the Court respectfully declines to apply the public domain doctrine.  Finally, the Court concludes—absent any argument to the contrary from Plaintiffs—that DOJ's withholdings comport with the foreseeable harm standard set out in 5 U.S.C. § 552(a)(8)(A)(i)(I).  *See* [Doc. 80 at 34–35].

### CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)  Defendant's Second Motion for Summary Judgment [Doc. 62] is **GRANTED in part** and **DENIED in part** as set forth herein;

(2)  Regarding the chart pages, the Motion is **GRANTED** as to DOJ's withholdings based on Exemptions 7(A) and 7(C), and **DENIED** as to Exemption 5;

(3)  Regarding the emails, the Motion is **GRANTED** as to DOJ's withholdings based on Exemptions 3, 5, 7(E), and 7(C);

(4)  Regarding the memorandum, the Motion is **GRANTED** as to DOJ's withholdings based on Exemptions 3 and 5;

(5)    The Motion is **DENIED as moot** as to all other claimed exemptions;

(6)    Based on these rulings, the Court finds that no other disclosures pursuant to

FOIA are required; and

(7)    The Clerk of the Court is **DIRECTED** to **TERMINATE** this case.

DATED:  March 27, 2026                    BY THE COURT:

Nina Y. Wang
United States District Judge